**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Thomas Fortune Fay and<br>The Fay Law Group, P.A.,<br><br>       Petitioners,<br><br>    v.<br><br>Allen L. Rothenberg, The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm, LLP,<br><br>       Respondents. | Civil Action No. 1:25-cv-07613-LAP<br><br>**Oral Argument Requested** |
| Allen L. Rothenberg, The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm, LLP,<br><br>       Cross-Petitioners,<br><br>    v.<br><br>Thomas Fortune Fay and<br>The Fay Law Group, P.A.,<br><br>       Cross-Petition Respondents. |  |
| Steven R. Perles, Perles Law Firm, P.C.,<br><br>       Petitioners,<br><br>    v.<br><br>Allen L. Rothenberg, The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm, LLP,<br><br>       Respondents. | Civil Action No. 1:25-cv- 08219-LAP |

Fay and Perles FSIA Litigation Partnership,

Petitioner,

v.

Allen L. Rothenberg, The Law Firm of Allen L. Rothenberg, and The Rothenberg Law Firm, LLP,

Respondents.

Civil Action No. 1:25-cv-08281-LAP

**MEMORANDUM OF LAW IN SUPPORT OF FAY'S PETITION TO VACATE AND IN OPPOSITION TO ROTHENBERG'S CROSS-PETITION TO CONFIRM THE FINAL AWARD**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

        A.      Factual Background ........................................................................................ 3

                1.     The *Peterson* Action ................................................................... 3

                2.     The Follow-On Cases .................................................................. 4

                3.     The Enforcement Litigation and Competing Claims ................... 5

                4.     The Marines Cooperation Agreement and the Litigation Cooperation and Settlement Agreement ....................................... 6

                5.     Continued Enforcement Litigation ............................................. 7

                6.     The Arbitration Agreement ......................................................... 8

        B.      The Arbitration.............................................................................................. 8

                1.     Rothenberg's Demand.................................................................. 8

                2.     The Proceedings........................................................................... 9

                3.     The Final Award........................................................................ 13

         C.      This Litigation.............................................................................................. 14

ARGUMENT.................................................................................................................. 15

I.     The award violates public policy because it conflicts with the Professional Rules of Conduct................................................................................................ 15

        A.      Rule 1.5(e) enshrines a well-defined and dominant public policy against creating fee arrangements without client consent................................. 15

        B.      The arbitrator's decision impermissibly allocated Rothenberg fees without client consent, defying ethical rules and violating public policy............. 17

        C.      Rothenberg's counterarguments are unpersuasive ............................... 18

II.    The arbitrator decided issues beyond the scope of what the parties agreed to arbitrate ...................................................................................................... 20

III.    The arbitrator exceeded the limits of his sanctions authority ........................................... 23

    A.    The sanctions award exceeded the arbitrator's authority under the parties' agreement and JAMS Rule 29.................................................................... 24

    B.    The sanctions award violates New York's public policy against punitive arbitration awards.............................................................................................. 26

CONCLUSION..................................................................................................................... 28

**TABLE OF AUTHORITIES**

**Cases**

*Barbier v. Shearson Lehman Hutton Inc.*,
948 F.2d 117 (2d Cir. 1991) ........................................................................ 28

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006) ........................................................................ 22

*Bulkmatic Transp. Co. v. Pappas*,
2002 WL 975625 (S.D.N.Y. May 9, 2002) ........................................ 24, 26

*Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*,
264 F. Supp. 2d 926 (N.D. Cal. 2003) ........................................................ 27

*City of Almaty, Kazakhstan v. Ablyazov*,
2021 WL 4846366 (S.D.N.Y. Oct. 18, 2021)............................................. 24

*Com. Union Ins. Co. v. Lines*,
378 F.3d 204 (2d Cir. 2004) ........................................................................ 15

*Eletson Holdings, Inc. v. Levona Holdings Ltd.*,
731 F. Supp. 3d 531 (S.D.N.Y. 2024) .................................................. 20, 25

*Eng v. Cummings, McClorey, Davis & Acho, P.L.C.*,
2009 WL 1543840 (W.D. Mo. June 2, 2009)............................................. 17

*Fahnestock & Co. v. Waltman*,
935 F.2d 512 (2d Cir. 1991) ........................................................................ 26

*Grynberg v. BP Expl. Operating Co.*,
92 A.D.3d 547 (N.Y. App. Div. 2012).......................................................... 27

*Hickey v. Scott*,
738 F. Supp. 2d 55 (D.D.C. 2010) .............................................................. 16

*Jacobson Holman, PLLC v. Gentner*,
244 A.3d 690 (D.C. 2021)............................................................................ 19

*John T. Brady & Co. v. Form-Eze Sys., Inc.*,
623 F.2d 261 (2d Cir. 1980) ........................................................................ 28

*Judge v. McCay*,
500 F. Supp. 2d 521 (E.D. Pa. 2007) .......................................................... 17

*Marcus v. Garland, Samuel & Loeb, P.C.*,
441 F. Supp. 2d 1227 (S.D. Fla. 2006) ....................................................... 17

*Matter of Silverberg (Schwartz),*
    75 A.D.2d 817 (N.Y. App. Div. 1980) ............................................................ 16, 17

*Moskowitz v. Jacobson Holman, PLLC,*
    2015 WL 6830266 (E.D. Va. Nov. 6, 2015) ............................................................ 19

*N.Y. & Presbyterian Hosp. v. N.Y. State Nurses Ass'n,*
    2024 WL 5107586 (S.D.N.Y. Dec. 13, 2024) ....................................................... 27

*Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFL-CIO,*
    915 F.2d 840 (2d Cir. 1990) ............................................................................... 15

*Paul v. Jud. Watch, Inc.,*
    571 F. Supp. 2d 17 (D.D.C. 2008) ..................................................................... 16

*Peterson v. Islamic Republic of Iran,*
    264 F. Supp. 2d 46 (D.D.C. 2003) ....................................................................... 3

*Peterson v. Islamic Republic of Iran,*
    515 F. Supp. 2d 25 (D.D.C. 2007) ....................................................................... 3

*ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.,*
    564 F.3d 81 (2d Cir. 2009) ............................................................................... 27

*Sands v. Menard, Inc.,*
    787 N.W.2d 384 (Wis. 2010) ........................................................................... 16

*Schwartz v. Merrill Lynch & Co.,*
    665 F.3d 444 (2d Cir. 2011) ......................................................................... 15, 18

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
    559 U.S. 662 (2010) ....................................................................... 2, 20, 22, 25

*Synergy Gas Co. v. Sasso,*
    853 F.2d 59 (2d Cir. 1988) ............................................................................... 27

*Virgilio v. City of New York,*
    407 F.3d 105 (2d Cir. 2005) ............................................................................. 27

*Weiss v. Carpenter, Bennett & Morrissey,*
    672 A.2d 1132 (N.J. 1996) ............................................................................... 16

**Regulations**

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0 ........................................................... 16

**Rules**

Am. Bar Ass'n Model R. of Pro. Conduct 1.5(e) (2020) ............................................... 17

D.C. R. Pro. Conduct 1.5 ...................................................................................................... *passim*

D.C. R. Pro. Conduct 8.4 ........................................................................................................ 20

D.C. R. Pro. Conduct, Scope .................................................................................................. 18

JAMS Comprehensive Arbitration Rules
    & Procedures R. 9 (effective June 1, 2021) .............................................................. 21

**Other Authorities**

Am. Bar Ass'n, Variations of the ABA Model
    Rules of Professional Conduct, Rule 1.5: Fees (last updated Mar. 2025),
    https://www.americanbar.org/content/dam/aba/administrative/
    professional_responsibility/mrpc-1-5.pdf.................................................................. 17

Restatement (Third) of the Law Governing Lawyers § 47 (2000) ............................................. 16

**INTRODUCTION**

This case arises from a dispute among attorneys over fees from litigation on behalf of victims of the 1983 Marine barracks bombing. Rothenberg, the claimant in the arbitration, had already received nearly $60 million in attorneys' fees for his role in identifying plaintiffs for the lead case, *Peterson v. Islamic Republic of Iran*. Pursuant to a 2007 "Co-Counsel Agreement," the parties agreed to a one-third division of fees from their representation of a list of 101 servicemen and their families. Fay and Perles expressly *rejected* Rothenberg's proposal to include in that contract a fee-splitting provision as to any other *future* cases, and Rothenberg signed on without that provision.

Nevertheless, years later, Rothenberg decided he wanted more. He asserted that Fay and Perles owed him compensation because their *Peterson* clients—some of whom were also Rothenberg's clients—had consented to a sharing agreement to resolve competing claims of priority to collect from Iranian assets. Rothenberg argued that this "Marines Cooperation Agreement" harmed him because, by allegedly reducing the amount his clients recovered from those assets, it "diluted" his fees.

The parties to this action agreed to arbitrate that carefully circumscribed dispute. Based on his "dilution" theory, Rothenberg asserted three claims in arbitration: breach of contract, declaratory judgment, and unjust enrichment. He claimed that by negotiating the Marines Cooperation Agreement, Fay and Perles violated an implied covenant of good faith in the Co-Counsel Agreement. He also argued in the alternative that Fay and Perles unjustly enriched themselves at his expense when they diluted his fees because they had an interest in fees from other plaintiffs who joined in the Marines Cooperation Agreement with the *Peterson* plaintiffs—*i.e.*, plaintiffs in future cases that were deliberately omitted from the Co-Counsel Agreement.

The arbitrator found in favor of Fay and Perles on Rothenberg's dilution theory. That determination, having resolved the issues that the parties had agreed to arbitrate, should have been the end of the matter. But the arbitrator had other ideas. Reaching beyond the proper scope of the arbitration to dispense "his own brand of … justice," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (cleaned up), he decided that Rothenberg was entitled to tens of millions of dollars in additional fees from plaintiffs who fired him or never hired him.

As further detailed below, that award should be vacated for several independent reasons. First, the award violates public policy because it conflicts with the Professional Rules of Conduct, which prohibit a division of attorneys' fees without client consent. Second, the award exceeds the scope of the parties' agreement to arbitrate. And third, the portion of the award issued as a "sanction" exceeds the arbitrator's sanctions authority and violates strong public policy against punitive arbitration awards.

2

## BACKGROUND

### A.    Factual Background

### 1.    The *Peterson* Action

In early 2001, Thomas Fay and Steven Perles agreed to work together to pursue cases against Iran under the Foreign Sovereign Immunities Act ("FSIA") to seek redress for Iran's involvement in the 1983 bombing of a Marine barracks in Beirut, Lebanon. They created the Fay and Perles FSIA Litigation Partnership, *see* Ex.1, and later engaged Rothenberg to assist with referrals, among other client management efforts. *See* Ex.11. Fay, Perles, and Rothenberg agreed that they would "share equal thirds of the net fees earned in the prosecution of the counts brought on behalf of each claimant [Rothenberg had] referred to [Fay and Perles]." *Id*. at 1.

Later in 2001, Fay and Perles filed *Peterson v. Islamic Republic of Iran*, No. 01-cv-02094 (the "*Peterson* Action") in the District Court for the District of Columbia. The court issued judgment in favor of the plaintiffs on all issues of liability. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 65 (D.D.C. 2003). Fay and Perles, through the Partnership, hired 14 attorneys to assist in their efforts to secure damages. Ex.30 ¶ 21. In September 2007, the court awarded $2.66 billion in damages. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 60 (D.D.C. 2007).

In November 2007, Rothenberg, Fay, and Perles memorialized their agreement regarding the division of attorneys' fees in the *Peterson* Action (the "Co-Counsel Agreement"), which provided that each of them would receive one-third of the net attorneys' fees obtained in *Peterson*. *See* Ex.2 at 1. The Co-Counsel Agreement also stated, "[t]his agreement shall supersede any prior agreements between us and our firms regarding this matter." *Id*.

In a previous draft of that agreement (the "Draft Co-Counsel Agreement"), Rothenberg had proposed that he, Fay, and Perles "[f]urther" agree as to *future* cases arising from the publicity of the Peterson Action that they would each "provide each other the opportunity … to handle such

3

matters jointly" and "further agree that any legal fee received will be divided equally among those of us who elect to participate in said representation." *See* Ex.3 at 1. Fay and Perles expressly rejected that proposal; they crossed out the paragraph regarding future cases and initialed the strike-through. *Id.* The executed Co-Counsel Agreement did not address a division of fees in any cases other than the *Peterson* Action, nor any future cases. *See* Ex.2 at 1.

The *Peterson* Action was brought pursuant to written contingent-fee retainer agreements governed by the D.C. Rules of Professional Conduct. *See* Ex.12 at 1-2. Fay and Perles represented all the *Peterson* plaintiffs. *See id.* at 1. Some *Peterson* plaintiffs referred by Rothenberg also hired Rothenberg. *Id.* Each client agreed in each retainer agreement to pay the attorneys, contingent upon and to the extent of collection, a fee of 33 and 1/3 percent of the total gross recovery from all claims and causes of action against Iran and its agents, plus an amount equal to the expenses for the case. *See* Ex.13 at 1.[1] The clients agreed that the fee would be divided among the attorneys "in an equal share." *Id*.

### 2.    The Follow-On Cases

After the liability judgment was entered in *Peterson*, new lawsuits were filed against the same defendants in the same court using the findings in the *Peterson* to achieve judgments. *See* Ex.10 at 7-9 & n.13. These suits are referred to as the "Follow-On Cases." *Id.* Some of the Follow-On Cases, referred to as "Direct" Follow-On Cases, were directly signed up by Fay and Perles. Rothenberg was not involved. *Id.*

Fay and Perles referred many of the new plaintiffs to other attorneys and sometimes other plaintiffs hired other attorneys. *See* Ex.12 at 3-4. Most of the Direct Follow-On Cases were handled

---

[1] Exhibit 13 is a representative sample of a retainer agreement executed by a plaintiff referred by Rothenberg.

primarily by counsel other than Fay and Perles for the initial process of getting judgments. *Id.* Some Direct Follow-On Cases were filed by Fay alone or by Fay with co-counsel other than Perles or Rothenberg. *See* Ex.10 at 7-8 & n.12.

Other Follow-On Cases, referred to as "Indirect" Follow-On Cases, were brought by other attorneys and built on the *Peterson* Action. Ex.10 at 7-9 & n.13. After those plaintiffs obtained their judgments, Fay and Perles each provided legal services in connection with enforcing the judgment. *See* Ex.12 at 4 (discussing identification of Iranian assets and lobbying efforts that were critical to collection); Ex.30 ¶¶ 24, 39-40 (similar). Rothenberg was not involved. *See* Ex.10 at 7-9 & n.13. The attorneys' fees in the Indirect Follow-On Cases were the subject of various agreements. Fay entered fee-splitting agreements with counsel for the plaintiffs in certain Indirect Follow-On Cases. *Id.* at 7-8 & nn.11-12. Fay and Perles later reached an agreement by which any fees that Fay earned as co-counsel (and any fees Fay earned in *Fain v. Islamic Republic of Iran*, No. 10-cv-00628 (D.D.C.), which Fay filed) would be split between Fay and Perles. *Id.*

### 3.    The Enforcement Litigation and Competing Claims

After the damages awards were entered in the *Peterson* Action in 2007, Fay and Perles began efforts to collect. Ex.12 at 4. After discovering Iranian assets worth roughly $1.8 billion that were owned by the Central Bank of Iran and held in an account owned by Clearstream, an international securities transfer system provider, in a branch of Citibank in New York City (the "Clearstream Assets"), Fay and Perles retained other counsel to assist with the collection effort. *Id.*

In 2010, a turnover action (the "Clearstream Action") was filed on behalf of the *Peterson* plaintiffs. *Peterson v. Islamic Republic of Iran*, No. 10-cv-04518 (S.D.N.Y.). Plaintiffs in other lawsuits who had obtained judgments against Iran, whether in the Follow-On Cases (as they

reached judgments) or based on claims arising out of terrorist attacks other than the Beirut bombing, filed competing claims to collect from the Clearstream Assets. *Id.* at 4-5.

The intervenors whose claims did not arise from the Beirut bombing included plaintiffs in four actions who had retained Rothenberg pursuant to contingent-fee agreements (the "Rothenberg Intervenors"). *See* Ex.10 at 12-13; Dkt.14 at 31-32 ¶ 49. Rothenberg referred the plaintiffs in those actions to other counsel, Stroock & Stroock & Lavan LLP ("Stroock"), who took those cases to trial and filed to intervene in the Clearstream Action. Stroock also represented Rothenberg. *See* Ex.14, Tr.113-14. The Rothenberg Intervenors, like other intervenors whose claims did not arise from the Beirut bombing, argued in the Clearstream Action that their claims had priority over the *Peterson* plaintiffs' claims.  *Id.*, Tr.110-12.

### 4. The Marines Cooperation Agreement and the Litigation Cooperation and Settlement Agreement

In February 2012, Fay sent a letter to the *Peterson* plaintiffs explaining the implications of the competing claims. *See* Ex.15. Fay's letter proposed a strategy to speed the collection effort and avoid the risk that the *Peterson* claimants would recover nothing from the Clearstream Action: negotiating a sharing agreement under which the funds recovered from that action would be distributed among *all* of the claimants—the *Peterson* plaintiffs, the plaintiffs in the Follow-On Cases, and the intervenors whose claims did not arise from the Beirut bombing—in proportion to the compensatory damages awarded in each case. *Id.* at 1-3. Every *Peterson* plaintiff consented to the proposals to share funds with the Clearstream Assets with other victims of the Beirut bombing and to negotiating an agreement with the intervenors whose claims did not arise from the Beirut bombing. Ex.12 at 5.

On February 21, 2012, Fay and Perles signed an understanding with counsel for plaintiffs in the Follow-On Cases filed on behalf of victims of the Beirut bombing. Some, but not all, of

those plaintiffs had already obtained judgments for compensatory damages. *See* Ex.4 at 2. Fay and Perles referred to this sharing arrangement as the "Marines Cooperation Agreement" (the "Follow-On Agreement" in the arbitration papers). Ex.4. The parties agreed that they would not seek to invalidate one another's claims in the Clearstream Action and that the total amounts collected by the parties would be pooled and distributed in proportion to each group's judgment amount. *Id.* ¶¶ 1-3. The parties also authorized Fay and Perles to enter into agreements with other groups that had claims against the Clearstream Assets such that the amounts recovered would be divided in proportion to the amounts of each group's compensatory damages award. *Id.* ¶ 6.

On June 5, 2012, Fay and Perles contacted the *Peterson* plaintiffs to inform them that Fay and Perles had completed negotiations with counsel for the other plaintiffs with claims in the Clearstream Action. Ex.16. That "Litigation Cooperation and Settlement Agreement" (also called the "87/13 Agreement") directed 87 percent of recovered funds to the plaintiffs whose claims arose from the Beirut bombing (the "Marines' Share") and the remaining 13 percent of recovered funds to other plaintiffs, which was proportionate to the amounts of their judgments. *Id.* at 2; Ex.5 at Recital 2, §§ 2.2.1, 5.1(b) (reflecting each group's compensatory damages awards and the corresponding division of funds). Every *Peterson* plaintiff consented to the Litigation Cooperation and Settlement Agreement. *See* Ex.12 at 5.

### 5.    Continued Enforcement Litigation

In 2013, the district court in the Clearstream Action granted partial summary judgment in favor of the *Peterson* plaintiffs and directed Citibank to turn over the Clearstream Assets to the court. *See* Ex.12 at 5. The court created a Qualified Settlement Fund into which the proceeds of the Clearstream Assets were to be deposited. *Id.* Ultimately, approximately $1.65 billion collected from the Clearstream Assets was allocated for the Beirut plaintiffs. Distributions were made from the Qualified Settlement Fund between late 2016 and 2020. *See* Dkt.14 at 41 ¶ 68. Additional

7

collection efforts for the remaining amount of the judgments obtained for the Beirut plaintiffs—more than $2 billion—are ongoing. Fay and Perles are involved in actions concerning another large securities asset seized in New York ("Clearstream II") and an office building in Manhattan ("650 Fifth Avenue"). *See* Ex.30 ¶¶ 152-55.

### 6.    The Arbitration Agreement

On December 4, 2017, Fay, Perles, and the Partnership entered into the Arbitration Agreement with Rothenberg. Ex.6. The agreement provided that the parties to the agreement would submit a "Fee Dispute" to arbitration with JAMS. *Id.* at Recitals A-D. The agreement defined that dispute as follows:

> A dispute (the "Fee Dispute") has arisen among the Parties relating to the attorneys' fees and litigation expenses in <u>Peterson v. Islamic Republic of Iran</u>, No. 10-4518 (S.D.N.Y.) and Nos. 01-2094 and 01-2684 (D.D.C.), <u>Valore v. Islamic Republic of Iran</u>, Nos. 03-1959, 06-516, 06-750 and 08-1273 (D.D.C.), <u>Murphy v. Islamic Republic of Iran</u>, No. 06-596 (D.D.C.), and <u>Estate of Bland v. Islamic Republic of Iran</u>, No. 05-2124 (D.D.C.) (collectively, the "Beirut Marine Cases"). The Fee Dispute is over whether Rothenberg is entitled to compensation from Fay and Perles caused by and/or related to sharing agreements between the plaintiffs and/or their attorneys in the Beirut Marine Cases (the "Beirut Marine Plaintiffs") and Marine victim and family plaintiffs (not represented by Rothenberg) and/or their attorneys in other actions against the Islamic Republic of Iran (collectively, with the Beirut Marine Plaintiffs, the "Marine Plaintiffs").

*Id.* at Recital A. The agreement further stated that "[t]he parties acknowledge that they are not executing this Agreement on behalf of any client, whose rights remain unaffected by this Agreement." *Id.* § V.

### B.    The Arbitration

### 1.    Rothenberg's Demand

On September 14, 2021, Rothenberg filed a Demand for Arbitration. Ex.7. The crux of the Demand was Rothenberg's assertion that the "Follow-On Agreement" (also called the "Marines Cooperation Agreement") "diluted Rothenberg's attorneys' fees under the Co-Counsel Agreement

by reducing the *Peterson* Plaintiffs' recovery; however, Respondents benefitted from the agreement because the agreement involved a sharing of that recovery with the plaintiffs in the Follow-On Cases, for whom Respondents claimed a greater share of attorneys' fees." *Id.* ¶ 18. Rothenberg asserted that Fay and Perles "concealed the Follow-On Agreement" and that "[t]hrough their actions with respect to the Follow-On Agreement, Respondents unjustly enriched themselves at Rothenberg's expense and violated the covenant of good faith and fair dealing." *Id.* ¶¶ 28-29. He also insisted that they "further breached the Co-Counsel Agreement and enriched themselves at Rothenberg's expense when they recovered from certain of the attorneys in the Follow-On Cases for harm to their attorneys' fees in the Peterson Action, but failed to account to Rothenberg under the Co-Counsel Agreement." *Id.* ¶ 35.

The Demand asserted claims for breach of contract and for unjust enrichment and demanded damages. *Id.* ¶¶ 37-48. Rothenberg also asserted that the parties "have a dispute over the division of future attorneys' fees under the Co-Counsel Agreement as a result of Respondents' actions" and demanded "a declaratory judgment setting forth his entitlement to future attorneys' fees from under the Co-Counsel Agreement sufficient to remedy the dilution and other damages caused by Respondents' improper actions." *Id.* ¶¶ 44-45.

### 2.    The Proceedings

The parties agreed "that the interpretation of the Arbitration Agreement shall be governed by New York Law." *See* Ex.18 ¶ 6. The arbitrator later chose New York law to govern the determination of the Fee Dispute. Ex.10 at 24.

Rothenberg testified, regarding the Marines Cooperation Agreement, that "the clients" "had no right to reduce [his] fee" and that in his opinion the agreement provided "no benefit" to the *Peterson* plaintiffs. Ex.19, Tr.200; *see also* Ex.14, Tr.157. Rothenberg further claimed that "Perles and Fay forced" the agreement on the clients, Ex.19, Tr.205; *see also* Ex.14, Tr.235, but

9

Rothenberg admitted that he never communicated any of these purported concerns to his *Peterson* clients. Ex.19, Tr.201, 206; Ex.14, Tr.170, 256-57. Fay grew concerned that Rothenberg was prioritizing his interest in his attorneys' fees over their shared clients' rights to enter into the Marines Cooperation Agreement, *see* Ex.20 ¶¶ 21-26, and that this self-serving behavior raised concerns under the D.C. Rules of Professional Conduct, *id.* ¶¶ 27-29.

On April 16, 2024, Fay and Perles sent a letter to inform the clients of their concern that Rothenberg "may have violated duties owed to you." *See* Ex.21 at 1. They also sent that letter to Rothenberg's counsel. *See* Ex.22 at 3 & n.4. The letter explained that they had consulted with ethics counsel and that it was "doubtful that anything would have been collected" from the Clearstream Assets "without the sharing agreements." Ex.21 at 1, 2. It stated that "if Mr. Rothenberg truly believed that the Marines Sharing Agreement was improper, then he should have told you that at some point and not just advanced claims seeking more attorney fees for himself regardless of what you actually received." *Id.* at 2-3. The letter emphasized that Fay and Perles understood that it was their ethical duty to inform the clients of information that might affect the clients' ability to collect on their judgments against Iran. *Id.* at 1, 4. The letter explained, "[i]t is now entirely up to you as to what, if anything, you want to do with the information. You have the absolute right to make changes to your legal team or to leave the team intact." *Id.* at 4. And it provided clients with Rothenberg's contact information. *Id.*

Rothenberg sought an order from the arbitrator requiring Fay and Perles to retract the letter. *See* Ex.23 at 1. On April 23, the arbitrator denied Rothenberg's request but stated that Rothenberg "shall be permitted to respond … by sending his own letter to the Peterson plaintiffs." *Id.* at 2. On May 28, Rothenberg wrote to the *Peterson* plaintiffs to ask that they "reserve judgment until receiving [his] response." *See* Dkt.14 at 57 ¶ 96. Rothenberg never sent an additional "response."

10

*Id.* At various times, including at least as early as April 22, 2024, many of the *Peterson* plaintiffs who had originally been referred by Rothenberg wrote to him to terminate his services. *See* Ex.22 at 4 & n.6; Ex.24 at 19. Those termination letters were sent solely to Rothenberg. Rothenberg did not inform Fay and Perles of the terminations and informed the arbitrator of only seven terminations. *See* Ex.26 ¶¶ 19-20; Dkt.14 at 57-59 ¶ 97 (failing to dispute that he did not inform Fay and Perles).

On May 15, the arbitrator ordered Perles and Fay "to facilitate, and not contest," Rothenberg's claim to payment of a "pro rata share of legal fees" in another collection action— this one regarding a property at 650 Fifth Avenue—"on account of the same individual Peterson plaintiffs from whom [Rothenberg] received legal fees" in the Clearstream Action. Ex.8 ("Order No. 7") at 11. The arbitrator also ordered them to provide Rothenberg "with a detailed written statement of all communications with the Peterson Plaintiffs, who are [Rothenberg's] clients, regarding [Rothenberg], the April 16, 2024, letter, or the subject of this arbitration" and to "continue" to do so "for any future communications with the Peterson Plaintiffs who are the Claimant's clients." *Id.* at 9-10.

In mid-November 2024, Fay and Perles learned from their clients for the first time that some of them who had previously been represented by Rothenberg had terminated him. *See* Ex.26 ¶ 52(i). It was not until December 2024 that Rothenberg finally disclosed to Fay and Perles the number of *Peterson* plaintiffs who had terminated him after the April 16 letter: "approximately 500" out of "roughly 550." *See* Ex.22 at 4 n.6. Those former clients continued to be clients of Fay and Perles. *See* Ex.26 ¶ 52(h).

Fay continued to communicate with her clients regarding her ethical concerns about Rothenberg's conduct. *See id.* ¶ 52(i)-(j). Fay did not know which clients had terminated

11

Rothenberg because neither the clients nor Rothenberg sent notice to Fay. *Id.* ¶ 52(i)*.* Because a funds distribution to the clients was forthcoming, Fay consulted ethics counsel. *See* Ex.27 ¶¶ 28-35. She asked each client if they had sent correspondence to Rothenberg, and if they had, to forward that correspondence to Fay. *Id.* ¶¶ 35-40. Fay also requested this information from Rothenberg but he never responded. *See* Ex.22 at 4-5 & n.6.

Rothenberg moved for sanctions under JAMS Rule 29 and "[i]n the alternative" to "amend the Demand," arguing that Fay's communications violated Order No. 7. *See* Ex.9 (the "interim award") at 6-8. The arbitrator granted Rothenberg's motion and issued an interim award. *See id.* at 22. Central to the sanctions award was the arbitrator's claim that he had "enjoined [Perles and Fay] from communicating any adverse information about the [Rothenberg] to any of the <u>Peterson</u> plaintiffs." *Id.* at 5. The arbitrator drew an "adverse inference … that the Respondents are cloaking themselves in the Rules of Professional Conduct to steal the Claimant's fees derived from the plaintiffs he represents in the <u>Peterson</u> action." *Id.* at 17-18.

The arbitrator awarded "payment to the Claimant of any shortfall in attorneys' fees from the <u>Peterson</u> plaintiffs that he represented when the [Qualified Settlement Fund] distributed the Clearstream I asset, due to his discharge of representation of any of them, and the attorneys' fees he collects from their recoveries" in ongoing collections actions, "or any other matter from which these clients recover payments on their judgments." *Id.* at 18. The arbitrator later issued a corrected interim award, included within the final award, *nunc pro tunc* to April 10, 2025. *See* Ex.10 at 64-75. After Perles pointed out that arbitrator had never prohibited Fay and Perles "communicating any adverse information about the Claimant to any of the <u>Peterson</u> plaintiffs or their counsel until the Final Award is issued in this arbitration," Ex.28 at 4, the arbitrator removed that language from the corrected interim award. *Compare* Ex.9 at 5, *with* Ex.10 at 66.

12

### 3.   The Final Award

In the final award, the arbitrator "reject[ed] [Rothenberg's] arguments that the [Fay and Perles] engaged in any wrongdoing by entering into the Marines Cooperation Agreement on behalf of their clients." Ex.10 at 40. Because the clients "had the right to agree to share the Clearstream I asset with other plaintiffs" and to agree "to the dilution of [Rothenberg's] attorneys' fees," Respondents, who entered into the Marines Cooperation Agreement on behalf of their clients, did nothing wrong. *Id.*

The arbitrator also determined that "the Respondents' failure to advise [Rothenberg] of the Marines Cooperation Agreement does not constitute a breach of the parties' contract," *i.e.*, the Co-Counsel Agreement, because "even if [Rothenberg] had been aware of the Marines Cooperation Agreement, it was [Rothenberg's] own clients' decision, not [Fay and Perles'] decision, to participate in that sharing, and it was the clients' decision to participate that diluted [Rothenberg's] fees." *Id.* at 41-42.

Next, the arbitrator entered a declaration finding that that the ruling in [Fay and Perles'] favor on the breach-of-contract claim "dooms that branch of [Rothenberg]'s request as set forth in his Demand … for a judgment declaring his entitlement to future attorneys' fees pursuant to the November 27, 2007[] Co-Counsel Agreement sufficient to remedy the dilution of his attorneys' fees." *Id.* at 51-52.

Despite having rejected the dilution theory underpinning the Demand, the arbitrator ruled in favor of Rothenberg on portions of his other claims and awarded him millions of dollars in attorneys' fees from clients who had never hired him. First, the arbitrator found in favor of Rothenberg on what the arbitrator called one "branch" of Rothenberg's claim for unjust enrichment. *See id.* at 42-49. The arbitrator found that when Fay and Perles negotiated with counsel in the Indirect Follow-On Cases for a share of fees, "they were unjustly enriched at [Rothenberg's]

13

expense." *Id.* at 47-48. The arbitrator stated that considering Rothenberg's contribution to the *Peterson* "work product" by referring plaintiffs, there was "no excuse" for Fay and Perles to "have excluded" Rothenberg "from the negotiation of these fees." *Id.* at 48-49. The arbitrator awarded Rothenberg $6,589,416 on this unjust-enrichment theory. *Id.* at 61, 79.

Second, the arbitrator denied Rothenberg's request "for a judgment declaring that the Respondents are directed to facilitate and not contest in any way [Rothenberg's] claim to direct payment of his one-third *pro rata* share of legal fees from any future recovery by the same individual *Peterson* plaintiffs from whom [Rothenberg] received legal fees in" the Clearstream Action. *Id.* at 52, 80. But the arbitrator stated that "[t]he denial of this branch of relief does not alter or affect the sanctions awarded" in the interim award. *Id.* at 53.

Finally, the arbitrator found that due to the ruling in Rothenberg's favor on the unjust enrichment claim, Rothenberg was entitled to a declaration "that [Fay and Perles] shall pay to [Rothenberg] 21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of" certain specified Indirect Follow-On Cases, "without [Rothenberg's] 21.61% of those fees coming into [Fay and Perles'] possession." *Id.* at 53-54.

### C.    This Litigation

On September 12, 2025, Fay timely filed the petition in this case seeking to vacate the award because the award violates public policy, the arbitrator decided issues beyond the scope of what the parties agreed to arbitrate, and the arbitrator exceeded the limits of his sanctions authority. Dkt.1. On October 3, Perles filed his own lawsuit seeking to vacate the award. *Perles v. Rothenberg*, No. 25-cv-08219 (S.D.N.Y.), Dkt.1. On October 6, counsel for Fay and Perles filed a petition to vacate for the Partnership. *Fay and Perles FSIA Litigation Partnership v. Rothenberg*, 25-cv-08281 (S.D.N.Y.), Dkt.1. On October 9, Rothenberg filed an answer and cross-petition to

14

confirm the award. Dkt.14. This Court consolidated the actions and directed the parties to file memoranda of law in support of their competing petitions. Dkt.25.

**ARGUMENT**

I.     **The award violates public policy because it conflicts with the Professional Rules of Conduct.**

The award must be vacated as against public policy because the award flouts the D.C. Rules of Professional Conduct. Rule 1.5(e), which requires client consent for a division of attorneys' fees, reflects a well-defined and dominant public policy that clients have the right to control how their fees are allocated. The entire award (including the sanctions component) conflicts with Rule 1.5(e) because it allocates millions of dollars in fees to Rothenberg for clients that fired him or never hired him, effectively rewriting the clients' fee agreements without their consent.

A.     **Rule 1.5(e) enshrines a well-defined and dominant public policy against creating fee arrangements without client consent.**

A court may vacate an arbitration award if it determines that enforcement of the award would violate public policy. *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011). For an award to be vacated on that basis, "the public policy must be well defined and dominant and must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (quotation marks omitted); *see also, e.g.*, *Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFL-CIO*, 915 F.2d 840, 845 (2d Cir. 1990) (vacating award on basis of public policy against sexual harassment in the workplace); *Com. Union Ins. Co. v. Lines*, 378 F.3d 204, 208 (2d Cir. 2004) (vacating award that would allow party to profit from fraud).

Binding ethical rules for lawyers can reflect "well defined and dominant" public policy. "[T]he Rules of Professional Conduct, at least to the extent that they are designed and interpreted to protect the public interest, express a clear mandate of public policy." *Weiss v. Carpenter, Bennett*

15

*& Morrissey*, 672 A.2d 1132, 1144 (N.J. 1996); *see also Hickey v. Scott*, 738 F. Supp. 2d 55, 62 (D.D.C. 2010) (recognizing that "[c]ontractual provisions that violate the attorney's rules of professional conduct undoubtedly fall into th[e] category" of terms that are "unenforceable on grounds of public policy" (quotation marks omitted)); *Sands v. Menard, Inc.*, 787 N.W.2d 384, 400 (Wis. 2010) (holding that "an arbitration award requiring an attorney to violate her ethical obligations is void as a matter of strong public policy"). The D.C. Rules of Professional Conduct are binding on attorneys. *Paul v. Jud. Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008).  Indeed, the public policy enshrined in the rules of professional conduct is so well established that disputes arising under them are non-arbitrable:  "As lawyers play a vital role in society, public policy requires that violations of the rules of professional conduct not be subject to negotiation and arbitration, but that such violations come before scrutiny of the courts[.]" *Matter of Silverberg (Schwartz)*, 75 A.D.2d 817, 819 (N.Y. App. Div. 1980) (citation omitted).

D.C. Rule of Professional Conduct 1.5(e) is one such rule. It provides that "[a] division of a fee between lawyers who are not in the same firm may be made only if," among other things, "[t]he client is advised, in writing, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged" and "[t]he client gives informed consent to the arrangement." *See also* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0:1.5(g). Rule 1.5(e) serves the public interest of protecting clients from having fee arrangements made without their consent. *See* Restatement (Third) of the Law Governing Lawyers § 47 cmt. *e* (2000) (observing that "fee-splitting arrangements" are "not permissible" absent "disclosure and client consent");

16

Am. Bar Ass'n Model R. of Pro. Conduct 1.5(e) (2020). And this public policy is so dominant that at least 47 of the 50 states have the same or a similar rule.[2]

Accordingly, in *Silverberg*, a New York court stayed the arbitration of a contract on the ground that the contract's "division of legal fees without regard to services actually rendered" is "void and against public policy." 75 A.D.2d at 819. Even though the contract contained a "broad" arbitration clause, *id.* at 818, the court explained that the professional rules prohibit lawyers from allocating fees to lawyers "without any professional responsibility for handling of the cases." *Id.* at 819. Similarly, courts frequently invalidate contracts that fail to comply with those rules. *See, e.g.*, *Judge v. McCay*, 500 F. Supp. 2d 521, 527 (E.D. Pa. 2007) (agreement for a referral fee is unenforceable because lawyers must obtain client consent to fee-splitting agreements); *Eng v. Cummings, McClorey, Davis & Acho, P.L.C.*, 2009 WL 1543840, at *5 (W.D. Mo. June 2, 2009) (similar); *Marcus v. Garland, Samuel & Loeb, P.C.*, 441 F. Supp. 2d 1227, 1230 (S.D. Fla. 2006) (similar). This case law confirms that fee-splitting rules reflect strong public policy.

**B.      The arbitrator's decision impermissibly allocated Rothenberg fees without client consent, defying ethical rules and violating public policy.**

The award effectively rewrote fee agreements without client consent by allocating fees to Rothenberg for clients that fired him or never hired him, conflicting with Rule 1.5(e)'s requirement of client consent for a division of attorney's fees.  In the sanctions award, the arbitrator granted Rothenberg fees from clients who fired him by awarding Rothenberg "any shortfall between attorneys' fees from the Peterson plaintiffs that he represented when the [Qualified Settlement Fund] distributed the Clearstream I asset, due to his discharge of representation by any of them,

---

[2] Am. Bar Ass'n, Variations of the ABA Model Rules of Professional Conduct, Rule 1.5: Fees (last updated Mar. 2025), https://www.americanbar.org/content/dam/aba/administrative/ professional_responsibility/mrpc-1-5.pdf.

and the attorneys' fees he collects from their recoveries in the 650 Fifth Avenue and USVSST matters, or any other matter from which these clients recover payments on their judgments." Ex.10 at 71. And on the merits, the arbitrator granted Rothenberg fees from clients who never hired him by (1) awarding Rothenberg $6,589.416 in damages under an unjust enrichment theory premised on the notion that his work on the *Peterson* Action entitles him to fees from clients he never represented; and (2) on the same theory, declaring that Fay and Perles must pay Rothenberg "21.61% of any future legal fees payable to them, directly or indirectly, from any future recovery on account of [certain] Indirect Follow-On cases." *Id.* at 78-81.

But neither the *Peterson* plaintiffs nor the Indirect Follow-On plaintiffs ever consented— much less in writing—to have a portion of the attorneys' fees from their cases allocated to Rothenberg. Although Rothenberg initially represented the plaintiffs in the *Peterson* Action, of the approximately 550 plaintiffs in that case that were his clients, approximately 500 *fired* him. *See* Ex.22 at 4. These plaintiffs did not consent to Rothenberg receiving fees—if anything, in firing him, they expressed a desire for Rothenberg *not* to be paid. *See* Ex.27 ¶ 41. Similarly, the Indirect Follow-On plaintiffs that *never hired* Rothenberg also did not consent to him receiving fees.

The award thus violates Rule 1.5(e)'s prohibition on fee-splitting arrangements without client consent. Because Rule 1.5(e) reflects a "well-defined and dominant" public policy, this Court should vacate the award. *Schwartz*, 665 F.3d at 452 (citation omitted).

### C.     Rothenberg's counterarguments are unpersuasive.

Rothenberg gestures at several counterarguments, none of which hold water.

*First*, Rothenberg argues that the Rules of Professional Conduct cannot support the vacatur of an arbitral award because they are "not 'intended to confer rights on an adversary of a lawyer to enforce the Rules in a proceeding other than a disciplinary proceeding,'" Dkt.14 at 69-70 ¶ 119 (citing D.C. R. Pro. Conduct, Scope ¶ 4).

That argument misses the point. Fay is not attempting to use Rule 1.5(e) to hold Rothenberg liable for a violation of ethical rules. The *award* is unenforceable to the extent it violates Rule 1.5(e). Nothing in the Rules bars such an argument. *See, e.g.*, *Jacobson Holman, PLLC v. Gentner*, 244 A.3d 690, 702 (D.C. 2021) (holding contract provision unenforceable as against public policy because it violated a professional rule prohibiting non-competes); *Moskowitz v. Jacobson Holman, PLLC*, 2015 WL 6830266, at *1 (E.D. Va. Nov. 6, 2015) (similar). The upshot of Rothenberg's argument is that an arbitrator could order a party to violate the ethical rules and a court would be obligated to compel that violation. That cannot be right.

*Second*, Rothenberg contends that the award of unjust enrichment damages for the Indirect Follow-On Cases—cases brought by plaintiffs whom Rothenberg never represented—does not amount to impermissible fee-sharing arrangement because, Rothenberg says, it is "simply an award of damages measured by attorney's fees." Dkt.14 at 68-69 ¶ 117. But Rothenberg does not deny that this award puts him in the same position as if he were entitled to a cut of each plaintiff's fees— an entitlement that, under Rule 1.5(e), can derive only from a fee-splitting agreement with client consent. Rothenberg retorts that "under Fay's logic, a wrongdoing attorney would be immune against claims of unjust enrichment wherever the subject matter of the wrongdoing involved legal fees." *Id.* That is incorrect. A claim of unjust enrichment simply cannot allocate fees without client consent.

*Third*, Rothenberg asserts that vacating the award here would "encourage co-counsel to attempt to solve fee disputes by manipulating the clients rather than by working with one another." Dkt.14 at 74 ¶ 124. That is a *non sequitur*, but in any event there was no "manipulation" here— only candid, accurate communication so that clients could make an informed judgment about their

19

representation. And other ethical rules prevent attorneys from actually "manipulating" clients. *See, e.g.*, D.C. R. Pro. Conduct 8.4(c) (barring "dishonesty, fraud, deceit, or misrepresentation").

**II.    The arbitrator decided issues beyond the scope of what the parties agreed to arbitrate.**

The FAA permits this Court to vacate an arbitration award where the arbitrator "exceeded [his] power[]." 9 U.S.C. § 10(a)(4). An arbitrator exceeds his power if he decides an issue beyond the scope of what the parties agreed to arbitrate, "effectively dispens[ing] his own brand of … justice." *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 578 (S.D.N.Y. 2024) (quoting *Stolt-Nielsen*, 559 U.S. at 671).

That is what happened here. The Arbitration Agreement did not authorize the arbitrator to resolve any and all potential disputes between the parties regarding fees in cases against Iran. Instead, the Agreement carefully circumscribed the bounds of the "Fee Dispute":

> A dispute … relating to the attorneys' fees and litigation expenses in *Peterson v. Islamic Republic of Iran*, No. 10-4518 (S.D.N.Y.) and Nos. 01-2094 and 01-2684 (D.D.C.), *Valore v. Islamic Republic of Iran*, Nos. 03-1959, 06-516, 06-750 and 08-1273 (D.D.C.), *Murphy v. Islamic Republic of Iran*, No. 06-596 (D.D.C.), and *Estate of Bland v. Islamic Republic of Iran*, No. 05-2124 (D.D.C.) (collectively, the "Beirut Marine Cases").

Ex.6 at 1. The Agreement also specifically defined the particular question that the parties agreed to arbitrate with respect to "attorneys' fees and litigation expenses" in those cases:

> whether Rothenberg is entitled to compensation from Fay and Perles caused by and/or related to sharing agreements between the plaintiffs and/or their attorneys in the Beirut Marine Cases (the "Beirut Marine Plaintiffs") and Marine victim and family plaintiffs (not represented by Rothenberg) and/or their attorneys in other actions against the Islamic Republic of Iran (collectively, with the Beirut Marine Plaintiffs, the "Marine Plaintiffs").

*Id.* The parties emphasized that "the Fee Dispute and any disputes arising out of this Agreement shall be the only claims arbitrated under this Agreement." *Id.* § II.A. They further agreed that the arbitration would be governed by the JAMS rules. *Id.* § II.A. The JAMS rules provide that "[n]o claim, remedy, counterclaim or affirmative defense will be considered by the Arbitrator in the

20

absence of … prior notice to the Other Parties" and that "Claimant's notice of claims is the Demand for Arbitration," which "shall include a statement of the remedies sought." JAMS Comprehensive Arbitration Rules & Procedures R. 9(a)-(b) (effective June 1, 2021).

The Demand raised three claims: a breach-of-contract claim, a claim for declaratory judgment as to "future attorneys' fees under the Co-Counsel Agreement," and an unjust-enrichment claim. Ex.7 ¶¶ 37-48. Each of those claims was based on Rothenberg's theory that the Marines Cooperation Agreement and the 87/13 Agreement had diluted his anticipated fees from the Peterson Action by allowing other victims of Iran-backed terrorism to share in any recovery from the same pool of assets. None of Rothenberg's claims addressed whether Fay and Perles allegedly had any obligation to include him in discussions with other attorneys when they negotiated fees for themselves in certain of the Follow-On Cases. And for good reason: Rothenberg had proposed such an arrangement in his draft of the Co-Counsel Agreement in 2007, Fay and Perles had specifically rejected that proposed provision, and Rothenberg agreed to sign the Co-Counsel Agreement without that provision. *See* Ex.3 (Draft Co-Counsel Agreement); Ex.2 (Co-Counsel Agreement).[3]

Indeed, the Demand consistently distinguishes between "sharing" agreements—a term it applies only to the Marines Cooperation Agreement and the 87/13 Agreement—and "referral fee arrangements," meaning Fay's and Perles's negotiation of fees for themselves in certain Follow-On Cases.[4] The Demand therefore makes clear that its claims as to "sharing agreements"—the

---

[3] Rothenberg implicitly recognized this when he styled his motion for sanctions as alternatively asking to "amend the demand," Ex.9 at 6, and his counsel even stated later that he didn't "believe that any of the issues raised" in the sanctions award "impact[ed] the merits arbitration that is closed," Ex.25, Tr.10.

[4] The Demand refers to a "[s]ecret [s]haring [a]greement," Ex.7 at 4, meaning the Marines Cooperation Agreement, *id.* ¶ 17, *see also id.* ¶¶ 18, 24, 32 (similar), and to "another sharing arrangement," meaning the 87/13 Agreement, *id.* ¶ 25. By contrast, when discussing Fay's and

topic the parties agreed to arbitrate, *see* Ex.6 at Recital A—concern the alleged dilution of Rothenberg's fees in *Peterson* as a result of the Marines Cooperation Agreement and the 87/13 Agreement. When the arbitrator ruled against Rothenberg on that dilution theory, Ex.10 at 39-42, that resolved the issues the parties had agreed to arbitrate.

Yet the arbitrator proceeded to "dispense[] his own brand of [economic] justice," *Stolt-Nielsen*, 559 U.S. at 671 (quotation marks omitted), by reaching out and deciding a dispute not set forth in the Demand or the Agreement. In particular, the arbitrator sided with Rothenberg on what the arbitrator described as a separate "branch" of the unjust-enrichment claim based on Fay's and Perles's negotiation of "fees for themselves in the Indirect Follow-On Cases to the exclusion of [Rothenberg]." Ex.10 at 46. The arbitrator then awarded Rothenberg forward-looking mandatory injunctive relief: that Fay and Perles "shall pay to [Rothenberg] 21.61% of any future legal fees payable to them" from any future recovery in certain Indirect Follow-On Cases. *Id.* at 81. That relief is likewise beyond the scope of the Demand, which requested declaratory judgment only as to "future attorneys' fees *from under the Co-Counsel Agreement*," Ex.7 ¶ 45 (emphasis added)—a demand on which the arbitrator sided with Fay and Perles, Ex.10 at 51-52.

That purported "branch" of the unjust enrichment claim was, in reality, a new creation; it was neither encompassed within the "Fee Dispute" nor noticed in the Demand. Nor would such a claim even have been tenable under the law of unjust enrichment. As the arbitrator himself acknowledged elsewhere in his decision, it is well-established that a party cannot recover under an unjust-enrichment claim regarding subject matter covered by a contract. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). Here, in entering

---

Perles's negotiation of fees for themselves in certain Follow-On Cases, the Demand refers instead to "referral fee arrangements." *Id.* ¶ 15.

into the Co-Counsel Agreement, Rothenberg accepted Fay and Perles's express rejection of his request for a cut of fees from their future cases. *See* Ex. 2; Ex. 3; Ex.10 at 10-11. Yet in manifest disregard of both the law of unjust enrichment and the scope of the parties' arbitration agreement, the arbitrator awarded Rothenberg a cut of those very same fees.[5]

Accordingly, the award should be vacated in its entirety on the ground that the Arbitrator exceeded his authority by deciding issues not contemplated by the Agreement.

### III.      The arbitrator exceeded the limits of his sanctions authority.

The arbitrator's sanctions award makes Fay and Perles liable for all of Rothenberg's lost fees from more than *five hundred* clients who fired him—amounting to millions of dollars, and potentially tens of millions of dollars, in damages.  That draconian award should be vacated not only because it violates the professional rules, *see supra* I.B, but for multiple additional reasons. First, the sanctions award exceeded the arbitrator's authority under the parties' agreement and JAMS Rule 29. Second, even assuming the sanctions were otherwise within the arbitrator's authority, the sanctions award conflicts with New York's unequivocal public policy barring punitive arbitration awards.

---

[5] The February 2023 report of Rothenberg's expert witness is further evidence that the claims in the Demand did not extend beyond the dilution theory. That report, Ex.17, asserted that Rothenberg's damages for unjust enrichment comprised the difference between the attorneys' fees that Fay and Perles received under the 87/13 Agreement and the fees that they would have received in the absence of the Marines Cooperation Agreement, *id.* ¶ 6 & tbl. 2; *see also id.* ¶ 37 & Illustration 5. Under the heading "Unjust Enrichment of Fay and Perles," the report asserts that "Fay and Perles enriched themselves at the expense of Rothenberg and others *by entering into the Follow-On Agreement*," *i.e.*, the Marines Cooperation Agreement. *Id.* at 9 & ¶ 30 (emphasis added). Likewise, regarding the claim for declaratory judgment, the report asserts that Rothenberg is entitled to a certain percentage of attorneys' fees "allocated to the 87% Group" to be consistent "with the share of total attorney's fees he would receive in the absence of the [Marines Cooperation Agreement]." *Id.* ¶ 41. Nothing in this report pertains to the theory of unjust enrichment on which the arbitrator sided with Rothenberg.

23

**A.** **The sanctions award exceeded the arbitrator's authority under the parties' agreement and JAMS Rule 29.**

In issuing the sanctions award, Arbitrator Crane relied solely on his purported authority under JAMS Rule 29. *See* Ex.10 at 70-71. That rule limits arbitrators to issuing "*appropriate* sanctions for the failure of a Party to comply with its obligations under [JAMS] Rules or with an order of the Arbitrator." (emphasis added). Such sanctions may include, for example, assessment of "fees" and "costs occasioned by the actionable conduct"; "exclusion of certain evidence"; "drawing adverse inferences"; "or, *in extreme cases*, determining an issue or issues *submitted to Arbitration* adversely to the Party that has failed to comply." (emphasis added). As common sense would suggest, and these examples confirm, an "appropriate" sanction is one that is reasonable, proportionate, and within the scope of the issues submitted to arbitration. Courts adhere to similar limits on their sanctions authority. *E.g.*, *Bulkmatic Transp. Co. v. Pappas*, 2002 WL 975625, at *2 (S.D.N.Y. May 9, 2002) ("Generally speaking, sanctions should be proportional to the gravity of the offense"); *City of Almaty, Kazakhstan v. Ablyazov*, 2021 WL 4846366, at *6 (S.D.N.Y. Oct. 18, 2021) (agreeing that "sanctions must be proportional to the harm and must be equitable").

The sanctions award here is the opposite of "appropriate." It saddles Fay and Perles with an astronomical penalty for allegedly violating Order No. 7, which required them to disclose to Rothenberg communications with shared clients about the arbitration. Ex.8 at 12-13. In the April 16, 2024 letter that precipitated Order No. 7, Fay and Perles conveyed their concerns to their clients but made clear that the clients had every right "to leave the [legal] team intact." Ex.21 at 4. They also sent a copy of the letter to Rothenberg's counsel. *See* Ex.22 at 3. Notably, Order No. 7 did not enjoin Fay and Perles from communicating in any way with those shared clients—it only required them to make Rothenberg aware of certain communications. *See generally* Ex.8; *see also* Ex.28 at 4. And Order No. 6 invited Rothenberg to "respond … by sending his own letter to the Peterson

24

plaintiffs," Ex.23 at 2—an opportunity Rothenberg declined, Dkt.14 at 57 ¶ 96. After the issuance of Order No. 7, Fay undisputedly disclosed many subsequent communications to Rothenberg, *see* Ex.29 at 3-4, and the vast majority of Rothenberg's clients decided to fire him anyway, *see* Ex.22 at 4. But the sanctions award found that Fay and Perles had violated Order No. 7 by engaging in "clandestine communications" with their clients, and required them to pay Rothenberg the "shortfall" in the amount in fees he would ultimately have recovered but for his termination by hundreds of *Peterson* clients, *see* Ex.10 at 71, 73, 78—likely amounting to many millions of dollars. That grossly disproportionate award is not even remotely "appropriate."

Moreover, the sanction here went beyond even the "extreme" remedy referenced in Rule 29 because the arbitrator decided an issue that was *not* "submitted to [a]rbitration"—namely, whether Rothenberg is entitled to damages as a result of Fay allegedly encouraging their shared clients to fire him. When the parties agreed to arbitrate the "Fee Dispute," they did not thereby agree to arbitrate any *new* disputes that might come up during the arbitration. If Rothenberg believed he was entitled to damages as a result of Fay and Perles's communications with the *Peterson* plaintiffs, he could have raised that claim in an appropriate forum.[6] Yet Arbitrator Crane effectively charged Fay and Perles with tortious interference, resolved that claim against them on a sparse factual record, and railroaded them with a sweeping, multi-million-dollar award. That is a textbook example of an arbitrator reaching out and "dispens[ing] his own brand of [economic] justice." *Eletson*, 731 F. Supp. 3d at 578 (quoting *Stolt-Nielsen*, 559 U.S. at 671).

---

[6] Indeed, the arbitrator recognized that before Rothenberg moved for sanctions, "all of the merits that were … part of the disposition of the causative action in the demand for arbitration … ha[d] all been taken care of," and Rothenberg's counsel described the motion for sanctions as related to "Rothenberg's claim to fees *that had not been in dispute*." Ex.25, Tr.11-12 (emphasis added).

Rothenberg does not attempt to show that the sanction was an "appropriate" response to the alleged violation of Order No. 7. Instead, Rothenberg denies that the sanction was for "a failure to disclose communications to Rothenberg," recasting it as "focused on the impropriety of Fay and Perles' conduct as an end-run around the Arbitration." Dkt.14 at 81 ¶ 139; *id.* at 55 ¶ 92 (referencing the April 16, 2024 letter). But when the April 2024 letter was brought to the arbitrator's attention, the arbitrator did not sanction Fay and Perles for it; only after the alleged violations of Order No. 7 did the arbitrator issue the sanctions award. Furthermore, Rothenberg acknowledges that the sanction was "issu[ed] under JAMS Rule 29." Dkt.14 at 81 ¶ 139. Rule 29 authorizes sanctions only "for the failure of a Party to comply with its obligations under … [JAMS] Rules or with an order of the Arbitrator," *see* Ex.10 at 71 (quoting JAMS Rule 29), not for nebulous charges of "impropriety," Dkt.14 at 81 ¶ 139. So by definition, the basis for the sanction had to be the failure to comply fully with Order No. 7. Because the sanction was nowhere near "proportional to the gravity" of that alleged offense, *Bulkmatic*, 2002 WL 975625, at *2, it was well beyond the arbitrator's sanctions authority.

### B.    The sanctions award violates New York's public policy against punitive arbitration awards.

The sanctions award must also be vacated because it conflicts with New York's public policy barring punitive arbitration awards. The parties agreed that New York law would apply to the arbitration agreement, *see* Ex.18 ¶ 6, and Arbitrator Crane selected New York law to determine the parties' dispute, *see* Ex.10 at 24. Furthermore, the Second Circuit has held that when a district court exercises diversity jurisdiction in an action seeking to vacate an award, the court must apply "state law relating to the propriety of a punitive damages award by arbitrators." *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 518 (2d Cir. 1991). New York law unequivocally prohibits arbitrators from awarding punitive damages. *Id.* (collecting cases). An arbitrator's imposition of sanctions,

26

such as an award of attorneys' fees, complies with the "public policy against punitive arbitration awards" only if it is "compensatory, not penal, in nature." *ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*, 564 F.3d 81, 86-87 (2d Cir. 2009); *see also Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 926, 944-45 (N.D. Cal. 2003) (concluding that an arbitrator lacked power "to impose mounting punitive sanctions" in the form of a $10,000 daily fine).

An award is punitive if it is intended to punish what the adjudicator considers "egregious, reprehensible behavior," *Virgilio v. City of New York*, 407 F.3d 105, 116 (2d Cir. 2005), rather than merely to provide compensation for the harm caused by the misconduct. *See ReliaStar*, 564 F.3d at 86-87 (noting that "'[a]rbitrators have ... occasionally awarded attorney's fees'" where "such fees fairly compensated the party for costs incurred as a result of such actions" (quoting *Synergy Gas Co. v. Sasso*, 853 F.2d 59, 65 (2d Cir. 1988))). Whether the arbitrator characterizes an award as "punitive" is not dispositive; what matters is whether the award, in substance, is "punitive in nature." *Grynberg v. BP Expl. Operating Co.*, 92 A.D.3d 547, 548 (N.Y. App. Div. 2012) (vacating an arbitrator's $3 million sanction because it "was punitive in nature, regardless of the label attached").

Here, while Rothenberg emphasizes that Arbitrator Crane did not expressly "characterize the sanction as 'punitive,'" Dkt. 14 at 83 ¶ 141, the award was clearly punitive in nature. Arbitrator Crane charged Fay and Perles with "flagrantly" violating his order, dismissed their explanations for their actions as a "subterfuge" and a "smokescreen," and accused them of conspiring to "steal [Rothenberg's] fees." Ex.10 at 69-71. Moreover, unlike an award of compensatory damages, the sanctions award was not "tailored ... to compensate" Rothenberg for losses resulting from any violation of Order No. 7. *N.Y. & Presbyterian Hosp. v. N.Y. State Nurses Ass'n*, 2024 WL 5107586, at *5 (S.D.N.Y. Dec. 13, 2024), *appeal docketed*, No. 25-113 (2d Cir. Jan. 16, 2025). The arbitrator

27

made Fay and Perles liable, permanently and irrevocably, for any "shortfall" in fees resulting from the voluntary decisions of hundreds of Rothenberg's clients to terminate his representation, even though some of those terminations occurred before the arbitrator's May 15, 2024, order, and even though Fay had informed Rothenberg of at least some communications. Meanwhile, despite ample opportunity to communicate with the *Peterson* plaintiffs to present his side of the story, Rothenberg was either unable or unwilling to explain his conduct.

There is "no clearer example" of arbitrators exceeding their powers than when they issue a punitive award in a case governed by New York law. *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 122 (2d Cir. 1991). To be sure, a court will not simply "assume" that an award is punitive when it is not labeled as such *and* there is "no basis" in the record for inferring that the award is "punitive in nature." *John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir. 1980). But where, as here, "the circumstances" show that the award was in fact punitive, *id.*, the award cannot stand.

**CONCLUSION**

This Court should vacate the award in its entirety.

DATED:    New York, New York        **KING & SPALDING LLP**
          November 25, 2025

                            By:  */s/ Matthew D. McGill*
                                 Matthew D. McGill
                                 Alexander Kazam
                                 KING & SPALDING LLP
                                 1700 Pennsylvania Avenue NW
                                 Washington, DC 20006
                                 (202) 737-0500
                                 matthew.mcgill@kslaw.com
                                 akazam@kslaw.com

                                 *Counsel for Thomas Fortune Fay and*
                                 *The Fay Law Group, P.A.*

28

## CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION

I hereby certify that this Memorandum of Law in Support of Fay's Petition to Vacate and in Opposition to Rothenberg's Cross-Petition to Confirm the Final Award complies with the type-volume limitation of this Court's November 13, 2025 Order, Dkt.25, because it contains 8,971 words, excluding the parts of the document exempted by L. Civ. R. 7.1(c).

DATED:    New York, New York          **KING & SPALDING LLP**
              November 25, 2025

                          By:  */s/ Matthew D. McGill*
                                Matthew D. McGill

                                *Counsel for Thomas Fortune Fay and*
                                *The Fay Law Group, P.A.*